196 F.3d 818 (7th Cir. 1999)
 International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund and Central States Joint Board Health and Welfare Trust Fund, Plaintiffs-Appellants,
v.
Philip Morris Incorporated, et al., Defendants-Appellees.
Arkansas Blue Cross and Blue Shield, et al., Plaintiffs-Appellees,
v.
Philip Morris Incorporated, et al., Defendants-Appellants.
 Nos. 99-1014, 99-1197, 99-3396, 99-3397
 United States Court of Appeals, Seventh Circuit
 Argued September 21, 1999*
Decided November 15, 1999
Rehearing and Rehearing En Banc Denied in Nos. 99-3396 and 99-3397 December 16, 1999**
 
 Appeals from the United States District Court for the Northern District of Illinois, Eastern Division. Nos. 97 C 8113 & 97 C 8114--Blanche M. Manning, Judge.
 Appeals from the United States District Court for the Northern District of Illinois, Eastern Division. No. 98 C 2612--Elaine E. Bucklo, Judge.[Copyrighted Material Omitted]
 Before Easterbrook, Kanne, and Evans, Circuit Judges.
 Easterbrook, Circuit Judge.
 
 
 1
 States that sued tobacco companies have been promised more than $200 billion in settlement over a 25-year period. Awed by this success, health insurers (including ERISA welfare benefit funds) have filed me-too suits, contending that the tobacco producers must compensate the insurers for the costs of smokers' health care. Defendants have been unwilling to settle these suits, however, and insurers have lost all three cases that have reached appellate courts. See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912 (3d Cir. 1999); Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc., 185 F.3d 957 (9th Cir. 1999); Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 1999 U.S. App. Lexis 19576 (2d Cir. Aug. 18, 1999). Each court held that the loss suffered by insurers is too remote from the activity of making and promoting cigarettes--for insurers do not buy cigarettes but are affected only indirectly, through reverberations from smokers' decisions. Insurers usually may elect to litigate tort claims on behalf of their insureds, using the proceeds first to cover medical costs, but they have disdained the option. They want to recover directly from tobacco producers precisely in order to bypass the elements of subrogation actions--principally, that the insurer demonstrate the existence of a tort and the lack of any defenses to liability. By suing directly, plaintiffs seek to recover even if none of their beneficiaries could prevail in tort litigation. The three appellate decisions disapprove this maneuver and hold that insurers may recover only to the extent that they can step into the shoes of their insureds. Plaintiffs in cases that we have consolidated for consideration want us to depart from these decisions.
 
 
 2
 Welfare benefit funds usually turn heaven and earth to ensure that litigation against them proceeds in federal court. Funds appear to believe that state judges are more liberal than federal judges with other people's money. Demonstrating consistency in this belief, the Teamsters Health and Welfare Trust Fund and the Central States Joint Board Health and Welfare Trust Fund filed suit against the cigarette manufacturers in an Illinois court. None of the tobacco manufacturers is incorporated or has a principal place of business in Illinois, so to forestall removal under the diversity jurisdiction the Funds named as defendants several local distributors. Defendants removed the suit anyway, contending that the distributors should be ignored because they are not realistically exposed to liability. See Poulos v. Naas Foods, Inc., 959 F.2d 69 (7th Cir. 1992). The Funds submit that the manufacturers collusively suppressed research into the health effects of tobacco, lied to the public about these effects, and conspired to suppress the output (and increase the price) of safer cigarettes. District Judge Manning concluded that the distributors' presence is an instance of fraudulent joinder, that the claim comes within the federal court's original jurisdiction, see 28 U.S.C. sec.1332(a), and therefore that it was properly removed under 28 U.S.C. sec.1441. 1998 U.S. Dist. Lexis 6831. She added that the complaint also alleges claims under federal law, so that sec.1331 likewise supplies original jurisdiction. Judge Manning then dismissed the complaint under Fed. R. Civ. P. 12(b)(6), ruling that all of the Funds' alleged injuries are too remote from the manufacturers' supposed wrongdoing.
 
 
 3
 While the Funds were trying to avoid federal court, several health insurers were eagerly seeking it out. The Blue Cross and Blue Shield associations of Arkansas, Connecticut, Illinois, Kentucky, Missouri, and North Dakota, joined by affiliated insurers (collectively "the Blues"), filed suit in the Northern District of Illinois under sec.1 of the Sherman Antitrust Act, 15 U.S.C. sec.1, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. sec.sec. 1961-68. Why federal court in Illinois as the venue for litigation against the tobacco industry? The answer appears to be Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 65 F.3d 1406 (7th Cir. 1995), which the Blues read as holding that they are entitled to sue directly for wrongs done to their insureds. This suit was assigned to District Judge Bucklo, who shares the Blues' understanding of Marshfield Clinic and denied the cigarette manufacturers' motions to dismiss. 47 F. Supp. 2d 936. Judge Bucklo concluded that the issue is debatable, however, and certified the issue for interlocutory appeal under 28 U.S.C. sec.1292(b) so that we could resolve the question. 1999 U.S. Dist. Lexis 12096. A motions panel accepted the appeals and consolidated the Blues' suit with the Funds' for appellate resolution. Although the rationale for certification was the desirability of obtaining a prompt answer to the question whether Marshfield Clinic commits this circuit to a position at variance with the other courts of appeals, our authority extends beyond this subject: we review the order, not the issue. Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 204-05 (1996); Edwardsville National Bank & Trust Co. v. Marion Laboratories, Inc., 808 F.2d 648, 650-51 (7th Cir. 1987). Thus both sides have briefed the appeals on the assumption that we will decide whether the Blues' complaint should be dismissed outright for failure to state a claim on which relief may be granted.
 
 
 4
 Federal jurisdiction is the first order of business, but discussion does not take long. Because the Funds' complaint explicitly invokes federal law, their suit "arises under" federal law for purposes of sec.1331 and therefore was properly removed under sec.1441. For example, para.261 of the lengthy complaint asserts that "[u]nless enjoined from doing so, Defendants will continue to engage in a contract, combination, or conspiracy in violation of 15 U.S.C. sec.1". Paragraph 8 of the complaint asserts that the claim arises under "federal and state laws, including civil RICO". The reference to federal law and RICO is telling. So defendants were entitled to remove--and this without any need for us to consider either fraudulent joinder or the complex question whether a claim of this nature by an ERISA welfare benefit fund arises under ERISA itself. Cf. Health Cost Controls of Illinois, Inc. v. Washington, 187 F.3d 703 (7th Cir. 1999).
 
 
 5
 Because three other appellate courts have issued comprehensive opinions on the merits of plaintiffs' claims, we just hit the highlights, mentioning only our principal reasons for agreeing with these decisions.
 
 
 6
 For more than 100 years state and federal courts have adhered to the principle (under both state and federal law) that the victim of a tort is the proper plaintiff, and that insurers or other third-party providers of assistance and medical care to the victim may recover only to the extent their contracts subrogate them to the victim's rights. See, e.g., United States v. Standard Oil Co., 332 U.S. 301 (1947) (holding that only Congress can authorize a direct claim by the United States to recover the cost of medical care furnished to soldiers); Mobile Life Insurance Co. v. Brame, 95 U.S. 754 (1877) (federal common law); Rock Island Bank v. Aetna Casualty & Surety Co., 692 F.2d 1100, 1106-07 (7th Cir. 1982) (Illinois law); Anthony v. Slaid, 52 Mass. 290 (1846). But plaintiffs forswear subrogation, denouncing that mechanism as inadequate because smokers' suits against cigarette manufacturers usually are unsuccessful. Indeed they are; juries in these suits tend to believe that, although tobacco is an inherently dangerous product, the smokers knew and accepted the risks of their activity. See W. Kip Viscusi, Smoking: Making the Risky Decision 62-86 (1992) (finding that smokers overestimate the hazards); John Z. Ayanian & Paul D. Cleary, Perceived Risks of Heart Disease and Cancer Among Cigarette Smokers, 281 J. Am. Medical Ass'n 1019 (1999) (finding that smokers are substantially more likely than nonsmokers to predict health problems for themselves, but that a large portion of smokers view themselves as having an average likelihood of avoiding heart disease and cancer). The hazards of tobacco are today widely known, reflected in stern warnings on every package of cigarettes; the Surgeon General issued a public alert 35 years ago; many smokers who got into the habit before then were aware of tobacco's reputation as a dangerous product.
 
 
 7
 The outcome of smokers' suits is why the Funds and Blues want to sue in their own names; they choose antitrust and RICO because, in the Blues' words, "assumption of the risk, contributory negligence and similar defenses are not pertinent". This is exactly why plaintiffs must lose. A third-party payor has no claim if its insured did not suffer a tort; no rule of law requires persons whose acts cause harm to cover all of the costs, unless these acts were legal wrongs. The food industry puts refined sugar in many products, making them more tasty; as a result some people eat too much (or eat the wrong things) and suffer health problems and early death. No one supposes, however, that sweet foods are defective products on this account; chocoholics can't recover in tort from Godiva Chocolatier; it follows that the Funds and the Blues can't recover from Godiva either. The same reasoning applies when the defendant is Philip Morris. If, as the Funds and the Blues say, the difference is that Philip Morris has committed civil wrongs while Godiva has not, then the way to establish this is through tort suits, rather than through litigation in which the plaintiffs seek to strip their adversaries of all defenses. Given the posture of these cases we must assume, as the complaints allege, that the cigarette manufacturers have lied to the public about the safety of their products. But lies matter only if customers are deceived. Whether smokers relied to their detriment on tobacco producers' statements is a central question in tort litigation, a question that cannot be dodged by the device of an insurers' direct suit.
 
 
 8
 Multiple rules of antitrust law interdict plaintiffs' efforts to enlist the Sherman Act in their campaign. The most obvious is the direct- purchaser rule of Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), and Kansas v. Utilicorp United Inc., 497 U.S. 199 (1990). These cases hold that only the immediate purchaser of goods may sue under the antitrust laws. Any other approach, the Court concluded, poses a risk of double recovery and makes calculation of damages a nightmare. Just so here. Plaintiffs allege that the cigarette manufacturers conspired to keep safer products off the market. The direct purchaser--the consumer who either paid too much for the product, or did not have access to a better product at the same price--is the smoker. Insurers' injury arises only indirectly. Permitting the insurers to recover creates a risk of multiple recovery, for smokers could file antitrust actions on their own behalf. Reiter v. Sonotone Corp., 442 U.S. 330 (1979). (Plaintiffs' contention that smokers could not recover under the antitrust laws because they are not injured in their "business or property", 15 U.S.C. sec.15(a), is silly. Paying too much, or getting an inferior product for the same money, or getting a product that causes deferred injury and medical expenses, causes a loss of one's money, which is "property." That's the point of Reiter, a consumer suit.) Insurers' recovery also would create a horrible problem of damages calculation- -and difficulty in calculating damages because the plaintiff's injury is remote from the antitrust violation is an independent obstacle to recovery. See Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983).
 
 
 9
 Plaintiffs say that they are injured by the amount they pay to provide medical care for smokers afflicted by lung cancer, heart disease, and other ailments. Put to one side the difficulty of determining what portion of these diseases is attributable to cigarettes. Statistical methods could provide a decent answer--likely a more accurate answer than is possible when addressing the equivalent causation question in a single person's suit. No, the problem for insurers is determining what it means for a financial intermediary to be injured by paying for medical care. Everyone dies eventually, usually after illness. An insurer must cover these costs even if the cause is natural. To determine damages, therefore, it is essential to compare the costs the insurers actually incurred against the costs they would have incurred had cigarettes been safer. Is death from lung cancer at age 60 more costly to an insurer than the same person's death from a different kind of cancer later in life? The longer an insured lives in good health, the more reserves an insurer accumulates to cover eventual illness; it is necessary to consider both the income and the expenditure sides of the insurer's balance sheet. The income side of the balance sheet includes higher premiums paid by smokers (or employers on smokers' behalf). Having collected extra money from the smokers (or groups of employees that comprise smokers) to cover the eventual illness, an insurer can't turn around and collect from the tobacco manufacturer for the same outlay. Insurers have actuaries whose life work is making accurate estimates of the costs of smoking (and other risky activities) and enabling the insurer to collect these in advance from insureds. An auto insurer that charges male drivers under the age of 26 an extra premium to reflect the increased probability of dangerous driving can't also sue auto manufacturers for selling cars to these drivers and putting the youths in a position to cause accidents. Logically insurers could collect only for the net outlay produced by the risky activity; but there will be such a net outlay only if the insurers' actuaries are not calculating rates correctly. Difficulties in determining damages for our plaintiffs would dwarf the difficulties that the Court held in Associated General Contractors prevented unions from collecting damages from employers that promoted non-union firms and thus undercut the unions' "business."
 
 
 10
 We do not doubt that cigarette smoking causes heart disease, lung cancer, other medical problems, and early death--all of which are costly to smokers, employers, and society as a whole. Smokers lose years of their lives; employers lose years of productivity; society loses not only this productivity but also the companionship and other benefits that the smokers provide to their families and loved ones. We may assume that at least in retrospect many smokers conclude that these costs exceed the pleasures of smoking. Our point is that smokers (and their employers) pay for the medical costs, in advance, through higher insurance rates (or, equivalently, lower wages in a medical-care-plus-wage compensation package). The Funds and the Blues are just financial intermediaries. They collect the premiums and spend them to provide the contracted-for care; their books balance whether the costs of care are high or low. Smokers, employers, and other purchasers of insurance, not the Funds and the Blues, foot the medical bill in the end.
 
 
 11
 Plaintiffs and a number of medical groups (such as the American Cancer Society) appearing on their behalf as amici curiae contend that this litigation will ensure that tobacco companies rather than smokers pay for the costs of illness. We very much doubt that courts have any ability to shift the costs of smoking in the long run. Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273, 282 (7th Cir. 1992). If tobacco companies must supply insurance with every pack, then the price of cigarettes will rise by the cost of that insurance (plus the administrative costs of providing insurance via the tort system); smokers still bear the costs in the end. See R.H. Coase, The Problem of Social Cost, 3 J.L. & Econ. 1 (1960). The amicus brief views the higher price per pack as a benefit, because people smoke less as price rises. See Gary S. Becker, Michael Grossman & Kevin M. Murphy, An Empirical Analysis of Cigarette Addiction, 84 Am. Econ. Rev. 396 (1994); Jon D. Hanson & Kyle D. Logue, The Costs of Cigarettes: An Empirical Case for Ex Post Incentive-Based Regulation, 107 Yale L.J. 1163, 1213-14, 1218 (1998) (citing other studies of demand elasticities). But rational smokers respond to real prices, not nominal ones. A pack of cigarettes that costs $1 and carries a deferred medical bill with a present value of $2 costs the smoker $3 in all; changing the price to $3 with no medical bill (because the seller will cover medical costs) does not affect the real price and therefore will not alter behavior unless consumers misunderstand what they are getting for their money. Plaintiffs, who accuse the defendants of deceiving smokers, can't argue that their proposed system is "good deceit" and therefore a social improvement. Anyway, the wisdom of a radical change in the payment system for medical services is for legislatures or markets to consider; it is no part of the judicial function (and not a reasonable interpretation of the Sherman Antitrust Act of 1890) to decree a sudden, ex post shift in the financial consequences of selling a consumer product by attaching what would amount to a regressive excise tax. See Stephen Williams, The More Law, the Less Rule of Law, 2 Green Bag 2d 403, 406-09 (1999); Jeremy Bulow & Paul Klemperer, The Tobacco Deal, Brookings Papers on Economic Activity (1999).
 
 
 12
 Lack of antitrust injury is a further problem with plaintiffs' position. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977); Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104 (1986); Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990); Ehredt Underground, Inc. v. Commonwealth Edison Co., 90 F.3d 238 (7th Cir. 1996). To recover under the antitrust laws, the plaintiff must show that its injury flows from that which makes the conduct an antitrust problem: higher prices and lower output. But the Funds and the Blues do not say that the output of cigarettes is too low as a result of a conspiracy; they say that it is too high! A lower output (or a higher price) might injure the smokers, who want to get their immediate pleasure for less, but it would benefit whoever pays for the smokers' medical care. The conspiracy that plaintiffs allege is not one to raise prices directly; it is a conspiracy to suppress evidence of risks and to keep safer products off the market. Cast either way, however, the claim is that the conspiracy raises the effective price. Disclosures that raise the smokers' estimates of cigarettes' danger would make them less willing to pay; the information would reveal that cigarettes are lower-quality products, which must sell for lower prices. Suppose the cigarette producers had brought safer products to market, selling them for the same price as their current products. The demand for these would have been higher (as consumers see them, the effective price is lower, because the deferred medical bill per pack is lower). Would total medical costs have gone up or down as a result, when each pack is safer but more packs are sold? That is a very complex question; some responsible students of the subject believe that the elasticity of demand is such that "safer" cigarettes are actually more dangerous in the aggregate (because nicotine per cigarette is down and the smoker needs more to get the same effect, because the medical cost per pack drops, or both). But no matter how this subject comes out, the debate is (a) at least as intractable as the elasticity questions in Illinois Brick and Associated General Contractors, and (b) unrelated to antitrust injury.
 
 
 13
 What we have said about antitrust carries over to RICO, because in Holmes v. SIPC, 503 U.S. 258 (1992), the Supreme Court applied to RICO the same approach to remote injuries that Associated General Contractors developed for antitrust. See also, e.g., Mid-State Fertilizer Co. v. Exchange National Bank, 877 F.2d 1333 (7th Cir. 1989); Carter v. Berger, 777 F.2d 1173 (7th Cir. 1985). The injury for which the plaintiffs seek compensation is remote indeed, the chain of causation long, the risk of double recovery palpable because smokers can file their own RICO suits, and the damages wickedly hard to calculate, so the claim therefore flunks Holmes just as it flunked Associated General Contractors. The "racketeering acts" of which the plaintiffs complain all concern alleged misstatements about the relation between smoking and health. These statements were not made to the Funds and the Blues; they were made to society as a whole, and affected the Funds and the Blues (if at all) only because they may have influenced smokers.
 
 
 14
 Insurers responded not to the statements but to the medical results (and costs) of smoking; for insurers it is outcomes, not words, that matter. To the extent the manufacturers' statements were designed to influence Congress--to get favorable laws and ward off unfavorable ones--they cannot be a source of liability directly under the Noerr-Pennington doctrine. See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965); California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972); Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49 (1993). (Although the Noerr-Pennington doctrine originated in antitrust law, its rationale is equally applicable to RICO suits.) We doubt that the collateral effects of the statements on smokers and derivatively on insurers is a better source of liability. Even if it is sound in principle, however, it risks double recovery (smokers could bring their own RICO suits), and the translation from principle to damages has too many intermediate steps.
 
 
 15
 Whether or not the activities of which plaintiffs complain gulled unsophisticated customers, they could not have deceived the insurers, who have on their staffs physicians with ready access not only to the Surgeon General's conclusions and medical databases but also direct access to information about health costs. Of all entities in society, insurers have the best information about the relation between smoking and health problems. Plaintiffs hint at an argument that they were deceived by the tobacco companies and as a result did not conduct programs to educate their insureds about the dangers of smoking, which led to higher health expenses later on. The third circuit analyzes this variant of the argument in detail. 171 F.3d at 927-32. We agree with its conclusion that this contention is hopelessly speculative. Just what would the insurers have done, had they known more earlier? How effective would this campaign have been? Or: why should we think that insurers would succeed where the Surgeon General and warnings on the product failed? The insurers now have all the information they say they lacked years ago, but what reason have we to believe that this knowledge by insurers has affected cigarette consumption? How would any change have affected the receipt side of the insurers' ledger? Insurers have been offering lower rates to non- smokers for a long time; what is the net effect of these rates on smoking, health, and profits?
 
 
 16
 According to the plaintiffs and the district judge in the Blues' suit, Marshfield Clinic establishes that in this circuit, at least, insurers that paid medical bills are entitled to recover for injuries to patients. Unless we overrule Marshfield Clinic, they insist, we must depart from the views of the other circuits. But Marshfield Clinic does not countenance recovery by insurers whose balance sheets are affected by substances that made their insureds ill. Blue Cross and Blue Shield of Wisconsin contended that the Marshfield Clinic and its physicians monopolized the market for certain kinds of medical services in northern Wisconsin. Many of the overpriced services were paid for directly by the Blues; our panel stressed that "the money went directly from Blue Cross to the Clinic, and although the two entities were not linked by any overarching contract, each payment and acceptance was a separate completed contract. We do not think more is required to establish Blue Cross's right to sue to collect these overcharges." 65 F.3d at 1414. Direct payment of an overcharge to a monopolist satisfied both Illinois Brick and Associated General Contractors, we held. Although the Blues dealt directly with the accused monopolist in Wisconsin, neither the Blues nor the Funds have any direct dealings with the cigarette manufacturers. That makes all the difference, as we remarked pointedly in Marshfield Clinic: "If the patients paid the entire fees to the Clinic and then were reimbursed in whole or part by Blue Cross, the Clinic would be right: only the patients could sue." 65 F.3d at 1414. Here, the smokers alone bought and used tobacco products; plaintiffs may pay the resulting bills directly to hospitals and physicians, but this does not produce a direct injury, for physicians and hospitals are not committing any wrong (or conspiring with anyone else who is) against either the smokers or their insurers. Nelson v. Monroe Regional Medical Center, 925 F.2d 1555 (7th Cir. 1991), and In re EDC, Inc., 930 F.2d 1275 (7th Cir. 1991), the other cases on which the Blues principally rely, are similarly inapposite.
 
 
 17
 Because we have assumed throughout this opinion that both the Funds and the Blues pay hospitals directly, rather than reimbursing smokers, the Blues' arguments that they are entitled to special treatment as "direct payors" gets them nowhere. The problem for both the Funds and the Blues is not that they deal with smokers rather than with providers of medical care (though per Illinois Brick that would be a stopper) but that they do not deal with tobacco producers, the supposed wrongdoers. The Blues contend that they have a special role in the health care system, and in many respects this is true. But the differences do not affect analysis under antitrust laws or ERISA. The injury (if any) that the Blues sustain from the sale of tobacco products is no greater, no more direct, and no more easily ascertainable, than the injury suffered by ERISA welfare benefit funds or other kinds of insurers. To the extent that Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 36 F. Supp. 2d 560 (E.D. N.Y. 1999), as amended under the name National Asbestos Workers Medical Fund v. Philip Morris, Inc., 74 F.Supp.2d 221 (E.D.N.Y.1999), reaches a different conclusion, we disapprove it. (The district court's first decision in Blue Cross & Blue Shield of New Jersey fails to anticipate the second circuit's conclusion in Laborers Local 17 Health & Benefit Fund; the amended decision is a thinly disguised refusal to accept and follow the second circuit's holding.)
 
 
 18
 Finally, a brief mention of state law. Both the Funds and the Blues advance claims under state law. The Funds rely on Illinois law; we cannot tell whose law the Blues want us to apply. Their brief is a pastiche, turning from Texas's version of RICO to South Dakota's antitrust law to a decision of the Supreme Court of Minnesota, State v. Philip Morris Inc., 551 N.W.2d 490 (Minn. 1996), but not informing us what law the choice- of-law principles of Illinois (the forum state) would select for this suit. Minnesota is an outlier with respect to suits by remotely affected persons, and we cannot imagine any argument for the application of Minnesota law to the disputes between these plaintiffs and the defendants. Florida is a second outlier, having enacted a statute authorizing direct actions without regard to defenses that would be available when payors are subrogated to smokers' rights. Fla. Stat. sec.409.910(1). No one contends that Florida law governs our disputes, however, and at all events the Florida statute is limited to suits seeking to recover Medicaid outlays. Maryland has a weaker version of this law. 1998 Md. Laws 122. As far as we can see, the remaining 47 states enforce the normal rule that a third-party payor may recover as subrogee or not at all. Illinois, in particular, follows this rule. Adler v. William Blair & Co., 271 Ill. App. 3d 117, 648 N.E.2d 226 (1st Dist. 1995); Kraft Chemical Co. v. Illinois Bell Telephone Co., 240 Ill. App. 3d 192, 608 N.E.2d 243 (1st Dist. 1992). Illinois does not follow the Illinois Brick doctrine. 740 ILCS 10/7(2). But in other respects Illinois antitrust law uses the federal approach, see O'Regan v. Arbitration Forums, Inc., 121 F.3d 1060, 1066 (7th Cir. 1997) (holding that Illinois would apply the federal remoteness approach to a claim under state antitrust laws), and, as we have observed, the Illinois Brick doctrine is only one of several obstacles to insurers' recovery on an antitrust claim. The direct-purchaser doctrine of Illinois Brick and the direct-injury doctrine of Associated General Contractors are analytically distinct. Blue Shield of Virginia v. McCready, 457 U.S. 465, 476 (1982); Mid-State Fertilizer, 877 F.2d at 1336. Because Illinois' statutory alteration of the Illinois Brick doctrine appears to be the only potentially important difference between Illinois law and the law of the other states that has been thoroughly canvassed by our colleagues in other circuits, it is unnecessary to offer an extended treatment of Illinois law here.
 
 
 19
 In the Funds' case the judgment is affirmed. In the Blues' case the order is reversed, and the case is remanded with instructions to dismiss the complaint.
 
 
 
 Notes:
 
 
 *
 Appeals No. 99-1014 and 99-1197 were orally argued. The other two appeals were submitted on the briefs on October 15, 1999, because the court concluded that a second oral argument on the same subject was unnecessary.
 
 
 **
 Judge Ripple took no part in the consideration or decision of this case.