GROUP HEALTH PLAN, INC., a nonprofit Minnesota health maintenance organization; HealthPartners, Inc., a nonprofit Minnesota health maintenance organization; Plaintiffs,

v.

PHILIP MORRIS INCORPORATED; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; British–American Tobacco Company Limited; Lorillard Tobacco Company; Liggett Group, Inc.; United States Tobacco Company; Hill & Knowlton, Inc.; The Tobacco Institute, Inc.; and the Smokeless Tobacco Council, Inc.; Defendants.

Medica, a nonprofit Minnesota health maintenance organization and subsidiary of Allina Health System, Plaintiff,

v.

Philip Morris Incorporated; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; British–American Tobacco Company Limited; Lorillard Tobacco Company; Liggett Group, Inc.; United States Tobacco Company; Hill & Knowlton, Inc.; The Tobacco Institute, Inc.; and the Smokeless Tobacco Council, Inc.; Defendants.

Nos. Civ. 98–1036 (PAM/JGL), 99–1739 (PAM/JGL).

United States District Court, D. Minnesota.

Jan. 25, 2000.

Lawrence Zelle, Lawrence T. Hofmann, Richard Michael Hagstrom, Zelle Hofmann Voelbel & Gette, Minneapolis, MN, Lewis A. Remele, Jr., Gregory Paul Bulinski, Bassford Lockhart Truesdell & Briggs, Minneapolis, MN, for Group Health Plan, Inc., HealthPartners, Inc.

Lewis A. Remele, Jr., Gregory Paul Bulinski, Bassford Lockhart Truesdell & Briggs, Minneapolis, MN, for Medica.

Peter W. Sipkins, Robert A. Schwartzbauer, Mark John Ginder, Dorsey & Whitney, Minneapolis, MN, Michael R. Geske, Arnold & Porter, Washington, DC, Michael P. Carlton, VonBriesen & Purtell, Milwaukee, WI, Jack L. Lipson, David Eggert, Arnold and Porter, Washington, DC, Eric L. Dobberteen, Maurice A. Leiter, James L. Layden, Arnold & Porter, Los Angeles, CA, James Scarboro, Thomas Stoever, Alfred T. McDonnell, Arnold & Porter, Denver, CO, William Maledon, Osborn Maledon, Phoenix, AZ, for Philip Morris Inc.

James Stuart Simonson, Jonathan M. Redgrave, Gray Plant Mooty Mooty & Bennett, Minneapolis, MN, Jeffrey J. Jones, Jones Day Reavis & Pogue, Columbus, OH, Robert Klonoff, Jones Day Reavis & Pogue, Washington, DC, for R. J. Reynolds Tobacco Co.

Jack Michael Fribley, Lori Ann Wagner, Faegre & Benson, Minneapolis, MN, Kenneth Bass, Karen DeSantis, Richard A. Rice, Kirkland & Ellis, Brown & Williamson Tobacco Corp., Washington, DC, for Brown & Williamson Tobacco Co.

Kyle E. Hart, Richard G. Jensen, Fabyanske Westra & Hart, Minneapolis, MN, Kathy McFarland, Mary Elizabeth McGarry, Brian Lake, Ronald M. Neumann, Joseph McLaughlin, Jill C. Owens, Simpson Thacher & Bartlett, New York, NY, for B.A.T. Industries, P.L.C.

John Walter Getsinger, Leonard Street and Deinard, Minneapolis, MN, Amy Hendricks, Greenville, SC, Steven Vollins, New York, NY, for British American Tobacco Co. Ltd., BAT (U.K. & Export) Ltd.

David George Martin, Rider Bennett Egan & Arundel, Minneapolis, MN, Jeffrey S. Nelson, Susan D. Wolfe, J. Patrick Sullivan, Shook Hardy & Bacon, Kansas City, MO, Elizabeth Hoene Martin, Stillwater, MN, for Lorillard Tobacco Co.

Robert V. Atmore, Steven D. Kelley, Reuben A. Mjaanes, Lindquist & Vennum, Minneapolis, MN, for Liggett Group, Inc.

Richard Gary Mark, Diane M. Helland, Eric J. Rucker, Briggs & Morgan, Minneapolis, MN, for U.S. Tobacco Co.

Joseph T. Dixon, Jr., Neil M. Kliebenstein, Henson & Efron, Minneapolis, MN, Marc Rachman, Bruce M. Ginsburg, Davis & Gilbert, New York, NY, for Hill & Knowlton, Inc.

Robert Lawrence Purdy, Kirk O. Kolbo, Maslon Edelman Borman & Brand, Minneapolis, MN, Steven Klugman, Steve Michaels, Debevoise & Plimpton, New York, NY, for Council for Tobacco Research–USA, Inc.

George W. Flynn, Flynn & Gaskins, Minneapolis, MN, for Tobacco Institute, Inc.

Geoffrey P. Jarpe, Maun & Simon, Minneapolis, MN, Barry Schaevitz, Parker Chapin Flattau & Klimpl, New York, NY, for Smokeless Tobacco Council, Inc.

Clifford M. Greene, Greene Espel, Minneapolis, MN, for Clifford Greene.

## MEMORANDUM AND ORDER

MAGNUSON, Chief Judge.

This matter is before the Court upon Defendants' Motion to Dismiss. For the following reasons, the Court grants Defendants' Motion in part and partially reserves Defendants' Motion for later determination.

### BACKGROUND

Plaintiffs are health maintenance organizations ("HMO's") attempting to recoup health care costs they have incurred as a result of their members' tobacco-related illnesses. Plaintiffs allege that Defendants conspired to mislead the public and the health care industry regarding the deleterious and addictive effects of tobacco use. Plaintiffs contend that they were directly and indirectly injured by this allegedly fraudulent course of conduct. In particular, Plaintiffs allege that they were directly injured by Defendants' fraudulent statements urging them not to engage in tobac-

co education programs. Plaintiffs argue that such programs could have prevented or decreased the occurrence of tobacco-related illnesses among their members. Plaintiffs allege that they were indirectly injured because they have been required to assume the medical costs sustained by their members as a result of tobacco use.

In their First Amended Complaint, Plaintiffs asserted nine counts including: violations of Minnesota's antitrust statutes, violations of Minnesota's consumer protection statutes, conspiracy, breach of a special duty, and the equitable theory of unjust enrichment. On April 29, 1999, this Court dismissed certain portions of Plaintiffs' First Amended Complaint. The Court dismissed without prejudice Plaintiffs' Minnesota consumer protection counts for failure to plead the necessary elements of the claim and dismissed with prejudice Plaintiffs' special duty count. Plaintiffs thereafter filed separate Second Amended Complaints in which they re-alleged violations of Minnesota's antitrust statutes, violations of Minnesota's consumer protection statutes, conspiracy, and unjust enrichment. Plaintiffs also added two Racketeer Influenced and Corrupt Organizations Act ("RICO") counts to the Complaints. Defendants now move to dismiss Plaintiffs' consumer protection, unjust enrichment, and RICO counts, arguing that Plaintiffs fail to state a claim upon which relief can be granted and that Plaintiffs have failed to join indispensable parties. See Fed.R.Civ.P. 12(b)(6) and 12(b)(7).

### DISCUSSION

#### A. Standard of Review

For the purposes of Defendants' Motion to Dismiss, the Court takes all facts alleged in Plaintiffs' Complaints as true. See Westcott v. Omaha, 901 F.2d 1486, 1488 (8th Cir.1990). Further, the Court must construe the allegations in the Complaints and reasonable inferences arising from the Complaints favorably to Plaintiffs. See Morton v. Becker, 793 F.2d 185, 187 (8th Cir.1986). A motion to dismiss will be granted only if "it appears beyond

**916**

doubt that the Plaintiff can prove no set of facts which would entitle him to relief." *Id.; see Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## B. Consumer Protection Statutes

Plaintiffs re-allege their claim under the Minnesota consumer protection statutes in Counts III–VI of their Second Amended Complaints. Defendants argue that Plaintiffs' consumer protection allegations contain new and residual defects that require dismissal as a matter of law. In particular, Defendants argue that Plaintiffs cannot properly plead a claim under Minnesota's consumer protection statutes because they are not "purchasers" of Defendants' products. (*See* Defs.' Mem. at 24–28.) Plaintiffs have moved to certify this question to the Minnesota Supreme Court. (*See* Pls.' Conditional Mot. to Certify Question to the Supreme Court of the State of Minnesota.) In a separate Order, the Court will grant Plaintiffs' certification motion. Therefore, Defendants' Motion to Dismiss Plaintiffs' consumer protection counts cannot be decided at this time. Accordingly, the Court reserves Defendants' Motion to Dismiss Counts III–VI of Plaintiffs' Second Amended Complaints pending the conclusion of the certification process.

## C. Unjust Enrichment

 In their Second Amended Complaints, Plaintiffs re-allege unjust enrichment as a basis of liability. Unjust enrichment claims are based upon the theory that "a person receiving a benefit, which it is unjust for him to retain, ought to make restitution or pay the value of the benefit to the party entitled thereto." *Mehl v. Norton*, 201 Minn. 203, 275 N.W. 843, 844 (1937). A party may only seek such equitable relief, however, when there is no adequate remedy at law. *See Michael–Curry Cos. v. Knutson Shareholders Liquidating Trust*, 423 N.W.2d 407, 410 (Minn. Ct.App.1988). Here, Plaintiffs allege that Defendants were unjustly enriched in two distinct ways. First, Plaintiffs maintain that Defendants were unjustly enriched by Plaintiffs' assumption of medical costs that should have been borne by Defendants. Second, Plaintiffs allege that Defendants were unjustly enriched by Plaintiffs' members, who purchased Defendants' cigarettes under a blanket of fraud.

Plaintiffs' original unjust enrichment claim was dismissed because this Court found that they had an adequate remedy at law: a claim for subrogation. *See Group Health Plan, Inc. v. Philip Morris, Inc.*, 68 F.Supp.2d 1064, 1070–71 (D.Minn. 1999). Because Plaintiffs may still may sue in subrogation, they may not assert an unjust enrichment claim on their own behalf. *See Michael–Curry*, 423 N.W.2d at 410. Plaintiffs alternatively argue, however, that they may sue on behalf of their members under the doctrine of associational standing, which permits an organization to sue to redress the injuries of its members.[1] *See Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

 In order to properly plead associational standing, an organization must, allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged

---

1. Plaintiffs failed to allege associational standing in their First Amended Complaint. In its Second Amended Complaint, however, Medica alleges that its members, "are suffering immediate and threatened injury as a result of defendants' wrongful conduct ... [and][a]s such, Medica bases this claim on associational standing." (Medica's Second Am.Compl. ¶ 262.) In somewhat more detail, Group Health Plan, Inc. and HealthPartners, Inc. (collectively "HealthPartners") make the same allegation on behalf of their members.

(HealthPartners' Second Am.Compl. ¶¶ 415–419.) Defendants argue that such conclusory statements are inconsistent with Plaintiffs' core allegations, which focus on the injury to Plaintiffs, rather than their members. Although this may be true, Plaintiffs are entitled to plead alternatively and they do allege injury to their members in support of their theory of associational standing. (*See* Medica's Second Am.Compl. ¶¶ 260–262; HealthPartners' Second Am.Compl. ¶¶ 414, 417–418.)

action of the sort that would make out a justiciable case had the members themselves brought suit ... So long as this can be established, and so long as the nature of the claim and the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

*Id.* In *Hunt v. Washington State Apple Adver. Comm'n,* the Supreme Court formulated the *Warth* criteria into a three-part test. 432 U.S. 333, 342, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Under *Hunt,* an organization must satisfy the following factors to qualify for associational standing: 1) the association's members must otherwise have standing to sue in their own right; 2) the interests the association seeks to protect are germane to the organization's purpose; and 3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See id.*

■■■ Before undertaking the *Hunt* tripartite analysis, however, the Court must first determine whether the plaintiff is the type of organization capable of asserting associational standing. Plaintiffs argue that the Minnesota Supreme Court conclusively settled this issue in *State of Minnesota,* in which it permitted Blue Cross to proceed against the same Defendants under a theory of associational standing notwithstanding the fact that Blue Cross had no "members." *See State of Minnesota v. Philip Morris,* 551 N.W.2d 490, 497–498

**2.** Medica argues that "[t]his Court has already recognized that it must be mindful of the Minnesota Supreme Court's decision in *State of Minnesota* when deciding issues of standing." (Medica's Mem. at 13.) In support of this assertion, Medica points to the following excerpt from this Court's previous Order in this case,

> The *State of Minn.* decision is clearly one of Minnesota substantive law because it analyzes the meaning of a state substantive statute. Thus, under the *Erie* doctrine, *this Court is bound by the Minnesota Supreme Court's decision regarding standing.*

(Minn.1996). Although Plaintiffs correctly articulate the holding of *State of Minnesota,* their argument reflects a misconception of federal jurisdiction. Simply put, notwithstanding a plaintiff's ability to sue in state court, plaintiffs in this forum must meet Article III standing requirements.[2] *See Metropolitan Express Servs., Inc. v. City of Kansas City, Missouri,* 23 F.3d 1367, 1369 (8th Cir.1994) (recognizing that while in a diversity case a federal court may not address the plaintiff's claim unless the plaintiff has standing to sue under state law, the plaintiff must also meet Article III standing requirements). Indeed, standing lies at the very heart of this Court's jurisdiction to hear any case.

> In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Article III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf.

*Warth,* 422 U.S. at 498–99, 95 S.Ct. 2197 (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Therefore, this Court must independently determine whether Plaintiffs meet Article III standing requirements.

*Id.* at 14 (emphasis added) (quoting *Group Health Plan, Inc.,* 68 F.Supp.2d at 1069). That declaration, however, refers to a very narrow aspect of standing. That is, although this Court must observe a private right of action created under Minnesota law, whether Article III standing requirements have been met is a wholly separate determination. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (rejecting the view that a legislatively created private right of action necessarily confers Article III standing upon litigants).

In order to meet Article III standing requirements under an assertion of associational standing, Plaintiffs' members must "possess all of the indicia of membership in an organization" such that the organization and its members are, in essence, identical. *Hunt,* 432 U.S. at 344, 97 S.Ct. 2434; *see NAACP v. Alabama,* 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (noting that the NAACP was the appropriate party to assert the rights of its members because it and its members were "in every practical sense identical"). In order to meet this "indicia of membership" test, the constituents of an organization must exercise a certain measure of control over the organization. *See id.; Health Research Group v. Kennedy,* 82 F.R.D. 21, 26–27 (D.D.C.1979). This requirement assures the substantial nexus between the organization and its members necessary to meet the Article III injury requirement. *See id.* at 26 ("Absent this element of control, there is simply no assurance that the party seeking judicial review represents that injured Party, and not merely a well-informed point of view").

In *Hunt,* the plaintiff's members were found to have possessed the requisite level of control even though they were not "members" in the traditional trade association sense. *See Hunt,* 432 U.S. at 344–345, 97 S.Ct. 2434. The Supreme Court based its decision, in part, on the following characteristics of the plaintiff's constituency:

> They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them. In a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests.

*Id.* at 344–345, 97 S.Ct. 2434.

In this case, Plaintiffs' members do not appear to possess any of these characteristics. In fact, Plaintiffs do not even allege the requisite indicia of membership. Instead, Plaintiffs describe themselves as health maintenance organizations that contract with health care service providers and purchase health care services for their members. (*See* Medica's Second Am.Compl. ¶ 8; HealthPartners' Second Am.Compl. ¶ 1.) Thus, the relationship between Plaintiffs and their "members" is most aptly described as a that of a business-consumer relationship, which is readily distinguishable from the traditional association-member relationship necessary to support an assertion of associational standing. Accordingly, it certainly would not "exalt form over substance" to differentiate between Plaintiffs and traditional membership organizations that typically qualify for associational standing. *Hunt,* 432 U.S. at 345, 97 S.Ct. 2434; *see American Legal Found. v. Federal Communications Comm'n,* 808 F.2d 84, 90 (D.C.Cir. 1987) (denying associational standing because the court could not "conclude, as could the Hunt Court, that the organization before [it] is the functional equivalent of a traditional membership organization"). This is not to say that Plaintiffs are insufficiently interested in the subject or even unqualified to debate these issues. It is clear, however that a " 'mere interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to [confer standing]." *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

In sum, Plaintiffs may not assert a direct equitable claim of unjust enrichment against Defendants because they have an adequate remedy at law. Furthermore, Plaintiffs' "members" simply do not possess the requisite indicia of membership to qualify Plaintiffs for associational standing. Accordingly, Plaintiff's unjust enrichment claim must be dismissed with prejudice.

## D. RICO

Plaintiffs allege that Defendants' collusive course of fraudulent con-

duct constituted a violation of RICO, thereby entitling them to recover treble damages. *See* 18 U.S.C. § 1964(c). In order to properly plead a civil RICO claim, Plaintiffs must allege that: 1) Defendants violated RICO; 2) Plaintiffs sustained a direct injury proximately caused by Defendants' violation; and 3) Plaintiffs sustained damages to their "business or property." *See* 18 U.S.C. §§ 1962, 1964(c); *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997). Defendants maintain that, as a matter of law, Plaintiffs cannot meet these pleading requirements. Defendants specifically argue that because Plaintiffs' injuries arise solely out of the personal injuries of their members allegedly caused by Defendants' conduct, they cannot meet RICO's proximate cause requirement.[3] The Court agrees.

Derivative claims that are "purely contingent" upon injuries to third parties, are considered too remote to meet RICO's proximate cause requirement. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 271–73, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). In *Holmes*, the plaintiff investor protection service alleged that the defendants engaged in a stock manipulation scheme that prevented two broker-dealers from meeting their obligations to customers. *See id.* at 261, 112 S.Ct. 1311. As a consequence of the brokers' default, the plaintiff was required to advance funds to the brokers to enable them to reimburse their customers. *See id.* The plaintiff thereafter sued the defendants for damages under RICO. *See id.* The Supreme Court ultimately found that the plaintiff's injury was simply too remote to constitute a cognizable claim under RICO. *See id.* at 276, 112 S.Ct. 1311. The Court explained that,

> Although the customer's claims are senior ... to those of the broker-dealers' general creditors, ... the causes of their respective injuries are the same: the broker-dealers simply cannot pay their

bills, and only that intervening insolvency connects the conspirator's acts to the losses suffered by the nonpurchasing customers and general creditors.

*Id.* at 271, 112 S.Ct. 1311 (internal citations omitted). In sum, an injury "purely contingent" upon injury to a third party does not meet RICO's direct injury requirement. *Id.*

Although *Holmes* involved the securities industry, it has been consistently read to preclude claims by third-party payors seeking reimbursement from the tobacco companies for expenditures related to the tobacco related illnesses of their members. *See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 241 (2d Cir.1999), *cert. denied*, — U.S. ——, 120 S.Ct. 799, 145 L.Ed.2d 673 (2000); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 933–34 (3d Cir.1999), *cert. denied*, — U.S. ——, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000); *International Bhd. of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris, Inc.*, 196 F.3d 818, 825–26 (7th Cir.1999); *Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 963–64 (9th Cir.1999), *cert. denied*, — U.S. ——, 120 S.Ct. 789, 145 L.Ed.2d 666 (2000); *Texas Carpenters Health Benefit Fund v. Philip Morris Inc.*, 199 F.3d 788, 789–790 (5th Cir.2000); *Rhode Island Laborers' Health and Welfare Fund v. Philip Morris, Inc.*, No. 97–500L, 1999 WL 619064, at * 8–9 (D.R.I. Aug.11, 1999); *Regence Blueshield v. Philip Morris*, 40 F.Supp.2d 1179, 1185 (W.D.Wash.1999); *Southeast Fla. Laborers Dist. Health & Welfare Trust Fund v. Philip Morris*, No. 97–8715, 1998 WL 186878, at * 5 (S.D.Fla. Apr.13, 1998).

Indeed, this very Court recently held that such third-party payor claims are too remote to sustain a RICO claim. *See*

---

**3.** Defendants also contend that Plaintiffs fail the third RICO requirement because they have not sustained an injury to business or

property. Because Defendants' first argument is dispositive, the Court does not reach this issue.

*Lyons v. Philip Morris*, No. 98–515, slip op. at 5–7 (D.Minn. Apr. 29, 1999). Plaintiffs argue that *Lyons* is distinguishable because they are "healthcare administrators and decision-makers" rather than mere "collector[s] of premiums." (Medica's Mem. at 15–16; *see* Group Health and HealthPartners' Mem. at 32.) This is a distinction is without a difference. Just as in *Lyons*, Plaintiffs' alleged damages hinge on the medical expenses they paid on behalf of their members and dependents. Had these members not smoked and subsequently not suffered from smoking-related illnesses, Plaintiffs would have no injuries to assert. Thus, Plaintiffs' injuries are purely contingent on injuries to third parties, regardless of their particular role in the health care insurance industry.

Plaintiffs also rely on *Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc.*, 36 F.Supp.2d 560, 588 (E.D.N.Y. 1999), which upheld a similar RICO claim. Although that case ostensibly provides support for Plaintiffs' argument, it has been heavily criticized for disregarding Second Circuit precedent. *See International Bhd. of Teamsters*, 196 F.3d at 827 (commenting that *Blue Cross and Blue Shield of New Jersey* represents a "thinly disguised refusal to accept and follow the second circuits's holding" in *Laborers Local 17 Health and Benefit Fund*, 191 F.3d at 229). In addition, as demonstrated above, *Blue Cross and Blue Shield of New Jersey* is simply contrary to the great weight of authority on this subject. Consequently, the Court is not persuaded by Plaintiffs' argument.

 Plaintiffs further argue that they have been directly injured because Defendants specifically intended to harm Plaintiffs—and not merely Plaintiffs' members—by discouraging them from implementing wellness and educational programs. Regardless of how the injury is characterized, however, the injury sustained by Plaintiffs remains contingent upon the personal injuries of their members. *See Steamfitters Local Union No. 420 Welfare Fund*, 171 F.3d at 927 ("Al-though the alleged wrongdoing was more directly aimed at the Funds, the injury itself certainly was no more direct than the indirect injury that arose from the defendants' actions toward smokers"). Once again, without the smoking-related injuries sustained by their members, Plaintiffs would not have been injured. Plaintiffs' injuries are, therefore, derivative and too remote to satisfy RICO. *See Laborers Local 17 Health and Benefit Fund*, 191 F.3d at 242 (noting that the existence of specific intent does not cure a lack of direct injury necessary under RICO). Moreover, Plaintiffs' theory is highly speculative. As recently articulated by Judge Easterbrook of the Seventh Circuit Court of Appeals,

> Just what would the insurers have done had they known more earlier? How effective would the campaign have been? Or: why should we think that insurers would succeed where the Surgeon General and warnings on the product failed? The insurers now have all the information they say they lacked years ago, but what reason have we to believe that this knowledge by insurers has affected cigarette consumption? How would any change have affected the receipt side of the insurers' ledger? Insurers have been offering lower rates to nonsmokers for a long time; what is the net effect of these rates on smoking, health, and profits?

*International Bhd. of Teamsters*, 196 F.3d at 826. Accordingly, Plaintiffs' RICO counts are dismissed with prejudice.

### E. Failure to Join Necessary Parties

In addition to arguing that Plaintiffs have failed to state a claim upon which relief can be granted, Defendants also argue that Plaintiffs' claim must be dismissed for failure to join necessary parties. *See* Fed.R.Civ.P. 12(b)(7) and 19. Because Defendants' Motion to Dismiss Plaintiffs' consumer protection counts has been reserved for later determination, it is not possible to definitively rule on Defendants' Rule 19 motion at this time. Accordingly,

the Court reserves the determination of Defendants' Motion to Dismiss for Failure to Join Necessary Parties pending the conclusion of the certification process.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint under Rules 12(b)(6) and 12(b)(7) of the Federal Rules of Civil Procedure is granted in part and partially reserved for later determination.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss (Clerk Doc. No. 113) is **GRANTED IN PART** and **PARTIALLY RESERVED FOR LATER DETERMINATION.**

2. Count VIII of Medica's Second Amended Complaint (Clerk Doc. No. 108) is **DISMISSED WITH PREJUDICE.**

3. Count IX of Medica's Second Amended Complaint (Clerk Doc. No. 108) is **DISMISSED WITH PREJUDICE.**

4. Count X of Medica's Second Amended Complaint (Clerk Doc. No. 108) is **DISMISSED WITH PREJUDICE.**

5. Count VIII of HealthPartners' Second Amended Complaint (Clerk Doc. No. 109) is **DISMISSED WITH PREJUDICE.**

6. Count IX of HealthPartners' Second Amended Complaint (Clerk Doc. No. 109) is **DISMISSED WITH PREJUDICE.**

7. Count X of HealthPartners' Second Amended Complaint (Clerk Doc. No. 109) is **DISMISSED WITH PREJUDICE.**

8. The determination of Defendants' Motion to Dismiss Counts III–VI of Medica and HealthPartners' Second Amended Complaints (Clerk Doc. No. 113) is **RESERVED.**