CONNECTICUT PIPE TRADES
HEALTH FUND, et al.,

v.

PHILIP MORRIS, INC., et al.

No. 397CV1305(JBA).

United States District Court,
D. Connecticut.

March 21, 2001.

Melvyn I. Weiss, Michael C. Spencer, Beth A. Kaswan, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Robert M. Cheverie, Cheverie & Associates, East Hartford, CT, Steven E. Fineman, Perry Weitz, Weitz & Luxenberg, New York City, for Health Fund and International Brotherhood of Elec. Workers, Local 90.

Michael M. Buchman, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, for International Brotherhood of Workers.

Benjamin A. Solnit, William R. Murphy, Timothy P. Jensen, Tyler, Cooper & Alcorn, New Haven, CT, Glory Martyn Lena, Tyler Cooper & Alcorn, Hartford, CT, Antonio Ponvert, III, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT, Steven C. Bennett, Jones, Day, Reavis & Pogue, New York City, Peter C. Hein, Barbara Robbins, Ben M. Germana, Wachtell, Lipton, Rosen & Katz, for Philip Morris, Inc. and RJ Reynolds Tobacco Co.

David M. Bernick, Kirkland & Ellis, Chicago, IL, James H. Rotondo, Day, Berry & Howard, Hartford, CT, Marjorie Press Lindblom, Peter Bellacosa, Kirkland

& Ellis, New York City, for Brown & Williamson Tobacco Corp. and American Tobacco Co.

John C. Yavis, Jr., Murtha Cullina LLP, Hartford, CT, for Bat Indus. PLC.

James R. Fogarty, Lawrence F. Reilly, Epstein, Fogarty, Cohen & Selby, Greenwich, CT, Gael Mahony, Bruce Falby, Dylan Sanders, Hill & Barlow, Boston, MA, Andrew P. Nemiroff, Epstein, Fogarty, Cohen & Selby, Greenwich, CT, for Lorillard Tobacco Co.

Paul M. O'Connor, Jr., Greenwich, CT, for Liggett & Myers Inc.

William H. Narwold, Cummings & Lockwood, Hartford, CT, Heather Victoria Taylor, John P. McKinney, Cummings & Lockwood, Stamford, CT, Joshua van Hulst, Paul, Hastings, Janofsky & Walker, Stamford, CT, for US Tobacco Co.

David L. Belt, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, for Council for Tobacco Research-U.S.A., Inc.

David L. Belt, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, Bourke G. Spellacy, Robert Reginald Simpson, Updike, Kelly & Spellacy, P.C., Hartford, CT, Steven Bruce Malech, Axinn, Veltrop & Harkrider, Hartford, CT, for Tobacco Inst., Inc.

Edward V. O'Hanlan, Elizabeth T. Grove, Cummings & Lockwood, Stamford, CT, Michael K. Stanton, Jr., Curtis, Mallet-Prevost, Colt & Mosle, Stamford, CT, for Smokeless Tobacco Council, Inc.

Dorit S. Heimer, Levett Rockwood, P.C., Westport, CT, for Hill & Knowlton, Inc.

**MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS TO DISMISS [Doc. ## 52, 55, 95, 97]**

ARTERTON, District Judge.

Plaintiffs, trustees of the Connecticut Pipe Trades Health Fund and the International Brotherhood of Electrical Workers Local 90 Benefit Plan, two Connecticut labor-management health and welfare trust funds ("the Funds") filed this class action suit against defendants Philip Morris, Inc., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Corp., B.A.T. Industries P.L.C., Lorillard Tobacco Co., Liggett & Myers, Inc., The American Tobacco Co., The Council for Tobacco Research, The Tobacco Institute and Hill & Knowlton, Inc. (collectively "the tobacco industry") seeking to recover for medical expenses paid by the Funds to cover smoking-related injuries suffered by members of the Funds' health plans. As discussed below, the legal theories under which the Funds argue they are entitled to prevail have shifted in the face of a rising tide of case law against benefits payor recovery suits.

All defendants have now moved to dismiss the complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) [Doc. ## 52, 97] or, in the alternative, for failure to join indispensable parties under Rules 12(b)(7) and 19 [Doc. ## 55, 95]. For the reasons discussed below, defendants' joint motion to dismiss for failure to state a claim is granted. Accordingly, the joint motion to dismiss for failure to join necessary parties is denied as moot.

## I. Background

### A. Procedural background

Originally, this suit was brought by the Funds on behalf of a putative class of all similarly situated labor union health and welfare funds in Connecticut, alleging violations of RICO, the Sherman Act, and various state statutory and common law claims. *See* Doc. # 1. Following the Second Circuit's grant of interlocutory appeal

in a factually identical case, the parties entered a joint stipulation of dismissal without prejudice pending the outcome of that case. *See* Doc. # 70. In 1999, the Second Circuit ruled that union funds did not have standing to pursue direct RICO or state common law fraud or special duty claims against the tobacco industry to recover for such payments. *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999). After the Supreme Court denied certiorari, the Funds filed a Second Amended Class Action Complaint [Doc. # 94] on behalf of the trustees of the Funds asserting claims solely under state consumer protection laws, the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42–110 ("CUTPA"), or, in the alternative, the New York General Business Law, §§ 349, 350 ("NYGBL"). That complaint is the subject of the current motion to dismiss.

### B. Factual background

At the heart of plaintiffs' 110 page Second Amended complaint[1] are its allegations that for decades the tobacco industry has conspired to deceive the public about the harms of smoking, despite its knowledge that "cigarettes are both deadly and addictive." Second Amended Compl. at ¶¶ 1–4. According to plaintiffs, the tobacco industry has manipulated nicotine levels in cigarettes to encourage addiction, engaged in deceptive and manipulative advertising and marketing of cigarettes despite knowledge of the health risks associated with smoking, and fended off meritorious lawsuits brought by individual smokers by engaging in a "strategy of attrition and delay." *Id.* at ¶¶ 3, 5, 8. These actions by defendants have led to "a human tragedy practically beyond comprehension," including the deaths of over 400,000 Americans each year. *Id.* at ¶ 9. Plaintiffs also allege that defendants' conduct has led to vast health care expenditures, including millions of dollars annually spent by the Funds to cover the smoking-related medical costs of union health plan participants. *Id.* at ¶¶ 11–13.

All of the foregoing is taken as true for purposes of deciding this motion to dismiss. *See Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir.2001).

### II. Discussion

#### A. Impact of Laborers Local

In *Laborers Local 17*, a case involving the same allegations of wrongdoing by the tobacco industry and identical alleged damages, the Second Circuit held that labor union health and welfare trust funds, claiming that the tobacco industry conspired to deceive the public about the dangers of smoking, lacked standing to pursue direct RICO and common law fraud and special duty claims because the economic injuries allegedly suffered by the funds were "entirely derivative of the harm suffered by plan participants as a result of using tobacco products." *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999). The court held that common law principles of proximate causation required plaintiffs to show direct injury as an inde-

---

1. Notwithstanding the Second Circuit's admonition against prolixity, *see Salahuddin v. Cuomo*, 861 F.2d 40, 41–42 (2d Cir.1988) (" '[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage' ") (*quoting* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1281, at 365 (1969)), plaintiffs' complaint is only somewhat shorter than Philip J. Hilt's *Smokescreen: The Truth Behind the Tobacco Industry Cover-up* (1996).

pendent element of proximate causation, and concluded that in this case, the "chain of causation linking defendants' alleged wrongdoing to plaintiffs' alleged injuries is too remote to permit recovery as a matter of law," *id.* at 234, because the injuries to the Funds were derivative of the injuries to the plan participants, *id.* at 239–41.

Relying on *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268–69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Circuit held that "where a plaintiff complains of injuries that are wholly derivative of harm to a third party, plaintiff's injuries are generally deemed indirect and as a consequence, too remote, as a matter of law, to permit recovery." The court noted that *Holmes* had laid out three factors, in lieu of a bright-line rule, to determine whether injuries are too indirect to afford standing under RICO:

> First, the more indirect an injury is, the more difficult it becomes to determine the amount of plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries. Third, struggling with the first two problems is unnecessary where there are directly injured parties who can remedy the harm without these attendant problems.

*Id.* at 236–37 (*citing Holmes*, 503 U.S. at 269–70, 112 S.Ct. 1311).[2]

The Second Circuit held that "the critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it

is direct." *Id.* at 239–40. However, it also noted in a footnote that "indirect" could not be "defined with absolute precision," and thus "to the extent that our description of 'indirect'· or 'derivative' injury might seem to encompass cases where recovery by the plaintiff would not run afoul of the policy concerns set forth above, the outer limits of the direct injury test are described more by those concerns than by any bright-line, verbal definition." *Id.* at 240 n. 4.

The court also considered and rejected the allegations of a direct "infrastructure harm" identical to that made by plaintiffs here:

> Plaintiffs declare that their complaint alleges a direct injury brought about by defendants' misconduct towards the Funds themselves. Plaintiffs allege that defendants misrepresented the health risks of smoking and the addictiveness of nicotine, causing the Funds to fail to implement smoking cessation programs, and deliberately shifting the costs of health care for tobacco related illnesses from the tobacco companies to the Funds.... Plaintiffs insist that these injuries were direct, since the 'activities of the Funds themselves were affected by defendants' misconduct.'

> Ultimately, however, whether plaintiffs' injuries are labeled as 'infrastructure harm' or 'harm to financial stability,' their damages are entirely derivative of the harm suffered by plan participants as a result of using tobacco products. Without injury to the individual smokers, the Funds would not have incurred any increased costs in the form of the payment of benefits, nor would they have experienced the difficulties of cost prediction and control that consti-

---

**2.** The court also found that plaintiff's common law fraud and special duty claims were barred as too remote and indirect. *See id.* at 242–43.

tuted the crux of their infrastructure harms. Being entirely contingent on harm to third parties, these injuries are indirect.

*Id.* at 239.

In particular, the court noted the difficulties the Funds would face in proving damages under their "infrastructure" theory:

> It will be virtually impossible for plaintiffs to prove with any certainty: (1) the effect any smoking cessation programs or incentives would have had on the number of smokers among the plan beneficiaries; (2) the countereffect that the tobacco companies' direct fraud would have had on the smokers, despite the best efforts of the Funds; and (3) other reasons why individual smokers would continue smoking, even after having been informed of the dangers of smoking and having been offered smoking cessation programs. On a fundamental level, these difficulties stem from the agency of individual smokers in deciding whether, and how frequently, to smoke. In this light, the direct injury test can be seen as wisely limiting the standing to sue to those situations where the chain of causation leading to damages is not complicated by the intervening agency of third parties (here, the smokers) from whom the plaintiffs' injuries derive.

*Id.* at 239–40.

Thus, *Laborers Local 17* stands as persuasive and binding precedent within this Circuit that, as to the policy concerns which define the outer limits of actionable injury under RICO and New York common law fraud and special duty, injuries such as the Funds allege are too remote and derivative, as they are based on harm to the plan participants. However, in a footnote seized upon by plaintiffs here, the Second Circuit in *Laborers Local* noted that "we re-emphasize that, depending on

the statute, the existence of common-law proximate causation is neither always necessary, nor always sufficient, to meet the requirement of statutory standing." 191 F.3d at 234 n. 3.

Because the plaintiffs have sued under both CUTPA and NYGBL, the first matter, therefore, is to determine which statute applies to plaintiffs' claims.

### B. Choice of law

 Plaintiffs' Second Amended Complaint asserts claims under both CUTPA and NYGBL. However, plaintiffs have indicated that they are pleaded in the alternative, depending on whether this Court finds that Connecticut or New York law applies to the conduct at issue here. Because this Court is sitting in diversity, Connecticut's choice of law rules apply to determine whether to apply CUTPA or NYGBL to plaintiffs' claims. *See Bailey Employment System, Inc. v. Hahn*, 655 F.2d 473, 475–76 (2d Cir.1981); *Travel Servs. Network v. Presidential Fin. Corp.*, 959 F.Supp. 135, 146 (D.Conn.1997)

Connecticut has adopted the choice of law rules set forth in the Restatement (Second) of Conflict of Laws. *See O'Connor v. O'Connor*, 201 Conn. 632, 649–50, 519 A.2d 13 (1986) ("It is therefore our conclusion that we too should incorporate the guidelines of the Restatement as the governing principles for those cases in which application of the doctrine of lex loci would produce an arbitrary, irrational result.").

Under the Restatement, "A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Restatement (Second) Conflict of Laws § 6(1). As the Restatement notes, however, statutes rarely incorporate an express choice of law provision. *See id.* § 6(1) cmt. a

On the other hand, the court will constantly be faced with the question whether the issue before it falls within the intended range of application of a particular statute. The court should give a local statute the range of application intended by the legislature when these intentions can be ascertained and can constitutionally be given effect. If the legislature intended that the statute should be applied to the out-of-state facts involved, the court should so apply it unless constitutional considerations forbid. On the other hand, if the legislature intended that the statute should be applied only to acts taking place within the state, the statute should not be given a wider range of application.

*Id.*

Plaintiffs argue that there is a potential conflict here because CUTPA "contains seemingly inconsistent 'directives' for its application, alternatively based on the place of defendants' misconduct or the place of the plaintiff's residence or injury." Pl. Opp. at 15. Plaintiffs further argue that if this Court adopts the place of injury as the controlling factor, "that interpretation is at odds with the statutory language in the NYGBL which provides that deceptive conduct *in New York* is prohibited; because of the different choice of law standards that would then necessarily govern choice of law determination by federal courts sitting in diversity in Connecticut versus New York, the result may well be that the Connecticut Funds have claims, depending on venue, both under Connecticut's consumer laws (asserted in this statewide class action) and under New York's consumer laws (asserted in the nationwide class action in New York)." *Id.*

For the reasons discussed below, the Court disagrees that there is a conflict of laws here. CUTPA prohibits any person from "engag[ing] in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a). "Trade or commerce" is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value *in this state.*" Conn. Gen.Stat. § 42–110a(1) (emphasis added). CUTPA permits "any person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42–110b" to bring an action "in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages," § 42–110g(a), and also provides that class actions on behalf of similarly situated persons "who are residents or this state or injured in this state" may be brought, § 42–110g(b).

■ As defendants note, plaintiffs' allegations here relate to false and deceptive sales and advertising, misrepresentations and other deceptive business practices by defendants that occurred in Connecticut; plaintiffs also allege that they and the putative class were injured in Connecticut by these deceptive practices. *See* Second Amended Compl. ¶¶ 19–33 (defendants advertised and sold cigarettes in Connecticut, and caused harm in Connecticut); ¶ 231 (deceptive information broadcast in Connecticut had economic impact on Funds in Connecticut); ¶ 256 ("While much of the unfair deceptive practices, including defendants' false advertising, emanated from New York, their economic impact upon the Funds occurred in Connecticut, and defendants' misconduct was tied to trade or commerce intimately associated with Connecticut."). While some of the conduct

which plaintiffs claim constitutes deceptive trade practices allegedly occurred outside of Connecticut—although not exclusively in New York—under the circumstances here, application of CUTPA to defendants gives effect to CUTPA's prohibition on deceptive practices in the conduct of trade or commerce in this state. *See Titan Sports v. TBS*, 981 F.Supp. 65, 71–72 (D.Conn.1997) (holding that CUTPA applies to out-of-state defendant whose allegedly deceptive acts occurred outside the state but were broadcast within Connecticut and injured plaintiff in Connecticut); *see also Fink v. Golenbock*, 238 Conn. 183, 212–13, 680 A.2d 1243 (1996) (CUTPA is "remedial in character . . . and must be liberally construed in favor of those whom the legislature intended to benefit.").[3]

Therefore, Connecticut law having been found to apply, the Court now turns to whether, as plaintiffs contend, CUTPA permits an action of this type.

### C. Statutory standing under CUTPA

In ruling on defendants' motion, this Court does not write on a blank slate. Numerous federal courts of appeals, including the Second Circuit, have rejected similar claims brought by other union funds and Blue Cross Blue Shield insurers under a variety of legal theories. *See, e.g., International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris, Inc.*, 196 F.3d 818 (7th Cir.1999) (antitrust and RICO claims); *Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957 (9th Cir.1999) (RICO, antitrust, Oregon's unfair trade practices act, fraud and unjust enrichment); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir. 1999) (antitrust, RICO, fraud, special duty and unjust enrichment); *Texas Carpenters Health Benefit Fund v. Philip Morris, Inc.*, 199 F.3d 788 (5th Cir.2000) (antitrust and RICO claims).[4] However, as the Second Circuit cautioned in *Laborers Local 17*, 191 F.3d at 234 n. 3, this jurisprudence should not be extended automatically to all other statutory causes of action, as other statutes may have differing standing requirements. Therefore, defendants' efforts to impress the Court with the weight—both literal and figurative—of authority against these claims notwithstanding, the question of whether plaintiffs state a claim under CUTPA cannot be answered without analyzing what is required under Connecticut law.

---

**3.** Moreover, although plaintiffs may be correct that a federal court sitting in diversity in New York might apply the NYGBL rather than CUTPA, a Comment to the Restatement clearly provides for just such an eventuality: "Provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature even when the local law of another state would be applicable under usual choice-of-law principles." Restatement (Second) § 6(1) cmt. a. This possibility alone does not establish a "conflict" of laws.

**4.** The Court notes that the Minnesota Supreme Court has recently ruled that such claims could go forward under the Minnesota consumer protection statute. *Group Health Plan, Inc. v. Philip Morris, Inc.*, C6–00–377, 2001 Minn. LEXIS 3 (Jan 11, 2001). However, the Minnesota consumer protection statutes differ from CUTPA and the ruling addressed only whether the plaintiffs had to be purchasers and had to plead and prove reliance. *See, e.g.*, Minn.Stat. § 8.31 (permitting suit by "any person injured by a violation"); Minn.Stat. § 325F.69 (deceptive practices enjoinable "whether or not any person has in fact been misled, deceived, or damaged thereby"); *see also International Brotherhood of Teamsters*, 196 F.3d at 827 ("Minnesota is an outlier with respect to suits by remotely affected persons. . . . As far as we can see, the remaining 47 states enforce the normal rule that a third-party payor may recover as subrogee or not at all.").

■ It is undisputed that CUTPA requires a showing that defendants proximately caused plaintiffs' injury. *See Abrahams v. Young and Rubicam, Inc.*, 240 Conn. 300, 306, 692 A.2d 709 (1997) ("[I]n order to prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act *and* that, 'as a result of' this act, the plaintiff suffered an injury. The language 'as a result of' requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff.") (emphasis in original). Whether, however, proximate cause under CUTPA includes the direct injury component identified as an element of proximate cause by the Supreme Court in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268–69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), and focused upon by the Second Circuit in *Laborers Local 17*, is the question in dispute here.

According to defendants, under Connecticut law, losses suffered by plaintiffs as a result of injury to a third party are too remote to permit recovery from the tortfeasor who caused the injury to the third party. Defs. Br. at 16–18. Defendants further argue that this "bar against remote and indirect claims" is incorporated into CUTPA's proximate cause requirement, citing *Abrahams*, 240 Conn. at 307, 692 A.2d 709. Defendants also note that the Seventh Circuit recently directed the dismissal of various state law consumer protection claims, including a CUTPA claim brought by Anthem Blue Cross Blue Shield of Connecticut, in a case brought by the Blue Cross Plans against the tobacco companies to recover for medical expenses.

*See Arkansas Blue Cross v. Philip Morris, Inc.*, 196 F.3d 818, 825 (7th Cir.1999).[5]

Plaintiffs respond that CUTPA does *not* require a showing of direct injury, and cite *Abrahams* for the proposition that CUTPA's proximate cause standard is "satisfied by a showing that the injury resulting from the conduct proscribed by the statute 'was of the same general nature as the foreseeable risk.'" Pl. Br. at 18. Plaintiffs also claim that because proximate cause may exist regardless of intervening causes, imposing a "direct injury" requirement on proximate cause is contrary to Connecticut law. Pl. Br. at 18–19. Therefore, plaintiffs argue, as the injuries they suffered were a foreseeable result of the defendants' "deceptive schemes," they have stated a claim under CUTPA. Pl. Br. at 20.

■ As a federal court sitting in diversity, this Court must first ascertain whether there is any clear, controlling precedent from the Connecticut Supreme Court; if not, the Court "must determine what this state's highest court would rule to be its law." *Hume v. The Hertz Corp.*, 628 F.Supp. 763, 765 (D.Conn.1986) (*citing Reeves v. American Broadcasting Cos., Inc.*, 719 F.2d 602, 605 (2d Cir.1983)).

As previously noted, CUTPA permits suit by "any person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42–110(b)." Conn. Gen.Stat. § 42–110(g)(a). In *Abrahams*, the Connecticut Supreme Court explained that this "as a result of" language requires a showing of

---

5. Defendants do not rely heavily on the *Arkansas Blue Cross* case, with good reason. In that decision, Judge Easterbrook noted that the court could not "tell whose law the Blues want us to apply. Their brief is a pastiche . . . (and does) not inform[ ] us what law the choice-of-law principles of Illinois (the forum

state) would select for this suit." 196 F.3d at 827. Although the complaint in *Arkansas Blue Cross* does, as defendants point out, allege a CUTPA violation, this claim clearly was not addressed in any detail by the Seventh Circuit—indeed, neither CUTPA nor Connecticut are even mentioned in the decision.

proximate cause in addition to actual but-for cause:

> Proximate cause does not exist merely because there is cause in fact. "Philosophically, cause in fact is limitless; but for the creation of this world, no crime or injury would ever have occurred. . . . Lines must be drawn determining how far down the causal continuum individuals will be held liable for the consequences of their actions." . . . "This line is labeled 'proximate cause.'"

240 Conn. at 306–07, 692 A.2d 709 (*quoting Stewart v. Federated Dep't Stores, Inc.,* 234 Conn. 597, 605–06, 662 A.2d 753 (1995); *Suarez v. Sordo,* 43 Conn.App. 756, 769, 685 A.2d 1144 (1996)). The court also held that "[t]he question to be asked in ascertaining whether proximate cause exists is 'whether the harm which occurred was of the same general nature as the foreseeable risk' created by the defendant's act." *Id.* (*quoting Doe v. Manheimer,* 212 Conn. 748, 758, 563 A.2d 699 (1989)).

In *Abrahams,* the plaintiff, a former Jamaican public official, alleged that his reputation was injured when the defendants engaged in a bribery scheme with a third party under the mistaken belief that the money would be used to bribe the plaintiff; the plaintiff's reputation was injured after he was indicted following defendants' erroneous reports to Connecticut and federal officials that the plaintiff had accepted bribes. *Id.* at 302, 692 A.2d 709. The plaintiff sued under CUTPA, claiming that he was injured by the bribery scheme. *Id.* The court concluded that the defendants' "bribery scheme did not, in and of itself, directly harm the plaintiff." *Id.* at 307, 692 A.2d 709. The court held that the defendants' attempt to bribe the plaintiff was not itself a proximate cause of his indictment on false charges and subsequent loss of reputation because that injury was not sufficiently foreseeable, observing that "[i]t was the confession, not the underlying bribery scheme, that directly and predictably led to the indictment against the plaintiff that damaged his reputation." *Id.* at 307–08, 692 A.2d 709.

Plaintiffs argue that *Abrahams'* directive that "[t]he question to be asked in ascertaining whether proximate cause exists is 'whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act," 240 Conn. at 306, 692 A.2d 709, means that the court rejected the requirement of direct injury. Pl. Br. at 18. Defendants, in contrast, seize on the language that the "bribery scheme did not, in and of itself, *directly* harm the plaintiff" to support their argument that *Abrahams* "expressly referenced the requirement of direct injury." Def.'s Rep. Br. at 3.

However, this Court is not persuaded that *Abrahams* addressed or answered the question at issue here. Although defendants correctly note that the court did focus on whether the harm was sufficiently direct, it did so in the context of determining whether it was foreseeable. The issue presented here, potential recovery for derivative or indirect harm, was simply not an issue in *Abrahams.*

■ Because the Connecticut Supreme Court has not directly addressed this question, the Court will apply the familiar canons of statutory construction to determine whether CUTPA includes a requirement of direct injury. *See Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000). The Court "look[s] first to the text of the statute. If that language is plain and its meaning sufficiently clear, [it] need look no further. Only if the text of the statute is not unambiguous [does the Court] turn for guidance to legislative history and the purposes of the statute." *Id.* (citations omitted).

The text of the statute here does not explicitly answer whether indirect or remote claims such as those at issue here are "as a result of" a defendant's actions. Although the Connecticut Supreme Court has held that the scope of conduct actionable under CUTPA is broader than that of common law fraud actions and that CUTPA had its roots in § 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), rather than common law, *see Associated Investment Co. L.P. v. Williams Assocs. IV*, 230 Conn. 148, 158, 645 A.2d 505 (1994), that court has looked to common law precedent when faced with ambiguities about the scope of CUTPA's proximate causation requirement. *See, e.g., Abrahams*, 240 Conn. at 306–07, 692 A.2d 709 (*citing Stewart*, 234 Conn. at 606, 662 A.2d 753; *Manheimer*, 212 Conn. at 758, 563 A.2d 699).[6] This Court therefore looks to other decisions of the Connecticut Supreme Court interpreting proximate causation as well as the purpose and history of the statute in determining whether CUTPA permits suits without any direct injury.

In 1856, the Connecticut Supreme Court held that a life insurer could not recover against defendants who negligently caused the death of one of the plaintiff's insureds except in subrogation, holding that in the absence of any direct obligations between the plaintiff and defendants, the injury to plaintiffs was "a remote and indirect consequence of the misconduct of the defendants, and not actionable." *Connecticut Mutual Life Ins. Co. v. New York & New Haven R.R. Co.*, 25 Conn. 265, 1856 WL 979,*8–9 (1856). Similar results have been reached more recently. *See, e.g., Fidelity & Cas. Ins. Co. v. Sears, Roebuck & Co.*, 124 Conn. 227, 199 A. 93 (1938) (contractor could not recover for workers compensation payments following injury caused by defendant to one of contractor's employees); *Steele v. J & S Metals, Inc.*, 32 Conn.Supp. 17, 335 A.2d 629 (Sup.Ct.1974) (dismissing claim brought by employer for lost profits resulting from an injury to a key employee who was negligently injured by defendant while at work).

Were there no more recent statement by the Connecticut Supreme Court on whether or when remote or indirect claims satisfy proximate cause requirements, there might be some appeal to plaintiffs' argument that reliance on "historical housekeeping 'rules' of 'remoteness' and 'direct injury'" is inappropriate in light of the massive public health tragedy allegedly caused by defendants' fraudulent acts. Pl. Br. at 7–8. However, in 1994, that court rejected a claim brought by an employer to recover for increased workers compensation premiums that the employer was forced to pay after the defendant negligently injured one of the plaintiff's employees, relying in part on the remoteness of the injury. *RK Constructors v. Fusco Corp.*, 231 Conn. 381, 387–88, 650 A.2d 153 (1994). The court observed that "[a]lthough it may have been foreseeable to Fusco that by causing an accident to the plaintiff's employee, the plaintiff's workers' compensation premiums would increase, this fact alone does not conclude our inqui-

---

6. The common law definition of proximate causation was similarly a source for the Second Circuit's determination that under RICO and federal antitrust statutes, injuries such as those alleged by the Funds here are too remote or derivative. *See Laborers Local 17*, 191 F.3d at 234 ("To determine in a given [RICO] case whether proximate cause is present, common law principles are applied."); see also, e.g., Steamfitters Local Union No. 420 v. Philip Morris*, 171 F.3d 912, 920 (3d Cir. 1999) ("Remoteness is an aspect of the proximate cause analysis, in that an injury that is too remote from its causal agent fails to satisfy tort law's proximate cause requirement-a requirement that the Supreme Court has adopted for federal antitrust and RICO claims.").

ry." The court went on to hold that because of the "measure of attenuation between Fusco's conduct, on the one hand, and the consequences to and the identity of the plaintiff, on the other hand, . . . we conclude that the economic harm to the plaintiff in the form of increased premiums and lost dividends is simply too remote to be chargeable to the defendant third party tortfeasor, Fusco." *Id.* at 388, 650 A.2d 153.[7] The harm to plaintiffs here is similarly remote.

Plaintiffs cite *Stewart v. Federated Department Stores, Inc.,* 234 Conn. 597, 662 A.2d 753 (1995),[8] *Haesche v. Kissner,* 229 Conn. 213, 640 A.2d 89 (1994)[9] and *Doe v. Manheimer,* 212 Conn. 748, 563 A.2d 699 (1989)[10] for the proposition that incorporating a "directness" requirement into

CUTPA is contrary to Connecticut law. Pl. Br. at 18–19. However, all those cases involved questions of whether the defendants' conduct was a proximate cause of the injuries suffered by the plaintiffs, and therefore none of them are dispositive of whether Connecticut law bars remote or derivative claims.

■ Unlike the cases permitting recovery despite intervening causes where the harm is within the scope of the risk created by the defendant's conduct, *see, e.g.,, Kiniry v. Danbury Hospital,* 183 Conn. 448, 455, 439 A.2d 408 (1981); *Miranti v. Brookside Shopping Center, Inc.,* 159 Conn. 24, 28, 266 A.2d 370 (1969), the plaintiffs here attempt recover solely for the harm to a third party.[11] The injured

7. Although the precise issue before the *RK Constructors* court was whether defendants owed a legal duty to the plaintiff, not whether there was proximate cause, the court noted that "[t]his inquiry is quite similar to the analysis that we engage in with respect to the third element of negligence, proximate causation." *Id.* at 387 n. 4, 650 A.2d 153.

8. In *Stewart,* the court held that a plaintiff who had been murdered in an inadequately lit and insufficiently guarded parking lot owned by defendants could recover against the defendants. 234 Conn. at 613, 662 A.2d 753.

9. The plaintiff in *Haesche* had been injured when playing with an air rifle, and sued the manufacturer under CUTPA, claiming that the manufacturer was liable for failing to warn of the risk of injury. 229 Conn. at 222–23, 640 A.2d 89. The Supreme Court upheld the dismissal of the CUTPA claim because the plaintiff had not shown that a warning would have changed his behavior, and thus the injury was not "a result of" the alleged improper warning. *Id.* at 224, 640 A.2d 89. There was no question of whether the injury suffered by the plaintiff was remote; the dispositive question was whether defendant's alleged misconduct was even an actual cause of plaintiff's injury.

10. In *Manheimer,* a woman was assaulted and raped in a vacant lot that was shielded by

overgrown vegetation from a neighboring property; she sued the landowner, claiming that his failure to remove the overgrown vegetation caused her injuries because, had the overgrowth not been present, the assault would not have occurred. 212 Conn. at 750, 563 A.2d 699. The court found this chain of causation too attenuated, noting that " '[r]emote or trivial [actual] causes are generally rejected because the determination of the responsibility for another's injury is much too important to be distracted by explorations for obscure consequences or inconsequential causes.' " *Id.* at 758, 563 A.2d 699 (quoting *Kowal v. Hofher,* 181 Conn. 355, 359–60, 436 A.2d 1 (1980)). The court held that because the harm suffered by the plaintiff was not within the scope of the risk created by defendant's negligent maintenance of his property, the plaintiff could not recover. *Id.* at 765, 563 A.2d 699.

11. Plaintiffs' conclusory allegations that their union health funds were "targeted" by the tobacco companies lack any supporting factual allegations. *Cf.* Pl. Br. at 12, *with* Second Amended Compl. at ¶¶ 64–69. Indeed, the *Tobacco Industry Labor Management Committee* (TILMC) described by plaintiffs did not include either of the two unions whose trustees brought this suit, *see id.* at ¶ 66, and plaintiffs' description of the damages sought in this action is clearly limited to recovery of

plan participants here are not an "intervening cause" between the plaintiffs and defendants; instead, it is only after the plan participants are injured that the harm that forms the basis for plaintiffs' obligation for payment of medical treatment costs results. Thus, such claims are labeled "derivative," and plaintiffs are entitled to bring these claims in subrogation on behalf of the injured participants. *See Laborers Local 17*, 191 F.3d at 239 (plaintiffs injuries are "entirely derivative of the harm suffered by plan participants as a result of using tobacco products").

Plaintiffs' attempt to analogize their injuries to that of a business seeking to recover for economic injuries caused by a defendant's deceit of its customers is unavailing. Pl. Br. at 5, 28. In that example, unlike here, the business sues not to recover for the injuries sustained by its customers as a result of the deceit but to recover for the losses it *directly* sustained as a result of losing its customers. Here, in contrast, the losses for which plaintiffs seek to recover are the medical costs incurred by the third party plan participants.[12]

 Instead, the Court finds that plaintiffs' claims are much more analogous to those brought by the employer to recover for increased workers compensation premiums following injury to one of its employees that were deemed too remote in *RK Constructors v. Fusco Corp.*, 231

Conn. 381, 387–88, 650 A.2d 153 (1994). Accordingly, the Court concludes that claims for remote or indirect injury are similarly barred under CUTPA. *See Collins v. Gulf Oil*, 605 F.Supp. 1519, 1523 (D.Conn.1985) ("To sustain a CUTPA claim, plaintiff must show that he was a direct victim of defendants' unfair practices.").

 This construction of CUTPA is also consistent with its legislative history and purpose:

> [T]he legislative history of CUTPA reveals that, although consumers were expected to be a major beneficiary of its passage, the act was designed to provide protection to a much broader class. According to Representative Howard A. Newman, who reported the CUTPA legislation out of committee to the House of Representatives, the act "gives honest businessmen great protection [against] deceptive or unscrupulous [businessmen] who by unfair methods of competition and deceptive advertising, etc., unlawfully divert trade away from law abiding businessmen."

*Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 496, 656 A.2d 1009 (1995) (*quoting* 16 H.R. Proc., Pt. 14, 1973 Sess., p. 7323). By limiting standing under CUTPA to those who were directly injured by a defendant's unfair trade practices, the intended beneficiaries of CUTPA are afforded full relief.[13]

---

benefits paid by the union health funds on behalf of injured plan participants, *see, e.g., id.* at ¶¶ 14, 248.

12. To the extent that plaintiffs argue that they suffered a direct "infrastructure" harm, that argument has already been rejected by the Second Circuit as an attempt to evade the direct harm requirement. *See Laborers Local 17*, 191 F.3d at 239.

13. Moreover, even if CUTPA did permit indirect or remote claims, an alternative basis for

dismissing plaintiffs' claims under CUTPA is the absence of any allegation of relationship between these plaintiffs and the defendants. Although CUTPA does not require privity or a consumer relationship, *see Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 496, 656 A.2d 1009 (1995), neither is it "so formless as to provide redress to any person for any ascertainable harm, caused by any person in the conduct of any 'trade' or 'commerce.' " *Jackson v. R.G. Whipple, Inc.,* 225 Conn. 705, 725–26, 627 A.2d 374 (1993). This Court views

**114**

In the absence of any indication from the Connecticut legislature or Supreme Court that such remote injury as alleged here was intended to by covered by CUTPA, the Court concludes that the Connecticut Supreme Court, if faced with this issue, would apply such a bar to cases brought under CUTPA, and accordingly holds that plaintiffs have failed to state a claim.

The Court has found that plaintiffs have failed to state a claim under CUTPA for the reasons discussed above—not, as plaintiffs suggest, out of "the temptation to clear [its] docket of undeniably time-consuming and demanding litigation," Pl. Br. at 8. Because of this disposition, the Court will not address the numerous other arguments raised by defendants in support of their motion to dismiss.

## III. Conclusion

For the foregoing reasons, defendants' joint motion to dismiss for failure to state a claim [Doc. ## 52, 97] is GRANTED as to all defendants.[14] Defendants' alternative joint motion to dismiss for failure to join necessary parties [Doc. ## 55, 95] is DENIED AS MOOT.

The Clerk is directed to close this case.

IT IS SO ORDERED.

the absence of *any* alleged connection or nexus—business, consumer, competitor, commercial or otherwise—between the union health funds and the tobacco industry, as barring plaintiffs' CUTPA claim. *See Bernbach v. Timex*, 989 F.Supp. 403, 412 (D.Conn.1996); *see also Gersich v. Enterprise Rent A Car*, Civ. No. 3:95cv1053 (AHN), 1995 WL 904917,*5 (D.Conn. Nov. 20, 1995); *Lilly v. Gillis*, No. CV9904254785, 2000 WL 640287,*3 (Conn.Super. April 20, 2000); *Mather v. Birken Mfg.*, No. CV960564862, 1998 WL 920267, *11 (Conn.Super.Dec. 8, 1998).

14. Although defendant B.A.T. Industries did not originally join the motion to dismiss, *see* Doc. # 52, it has since joined in this motion without prejudice to its defense of lack of personal jurisdiction. *See* Doc. # 101, at n. 1.